**In re BOSTON SCIENTIFIC COR-
PORATION SECURITIES
LITIGATION.**

Civil Action No. 05–cv–11934–DPW.

United States District Court,
D. Massachusetts.

March 10, 2009.

276

*MEMORANDUM AND ORDER*

DOUGLAS P. WOODLOCK, District Judge.

The Public Employees' Retirement System of Mississippi ("PERS") as Lead Plaintiff seeks to pursue this consolidated securities fraud action as a class action against defendants Boston Scientific Corporation ("Boston Scientific") and several of its corporate executives. PERS alleges that defendants violated §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), by knowingly withholding material information from the marketplace. Specifically, PERS alleges that defendants made misleading statements about a Boston Scientific medical product that was eventually recalled, thereby causing Boston Scientific's securities to be inflated artificially, allowing individual defendants wrongfully to enrich themselves, and harming investors.

PERS has moved to certify a class of plaintiffs comprising all those who acquired Boston Scientific equity securities between November 20, 2003 and July 15, 2004, inclusive ("the Class Period"). Defendants have opposed the motion for certification, arguing that PERS has failed to show that questions of law or fact common to the class predominate over questions affecting only individual members. I informed counsel at the hearing in this matter on February 25, 2009 I was disposed to grant the motion to certify the proposed class. For the reasons discussed more fully below, I now formally do so.

## I. BACKGROUND

### A. The Parties

Defendant Boston Scientific is a publicly traded manufacturer of medical devices based in Natick, Massachusetts. Individual defendants Peter M. Nicholas, James R. Tobin, Lawrence C. Best, Paul A. LaViolette, Fredericus A. Colen, Stephen D. Moreci, Paul W. Sandman, James H. Taylor, Jr., and Robert G. MacLean are corporate executives of Boston Scientific. Lead Plaintiff PERS is a Mississippi pension fund that purchased Boston Scientific stock during the Class Period.

## B.  Factual Allegations [1]

In 2001, Boston Scientific decided to produce a new drug-eluting coronary stent called the TAXUS Express Paclitaxel–Eluting Monorail Coronary Stent System ("the TAXUS stent").  Coronary stents are tubes implanted in a patient's arteries to facilitate blood flow.  The TAXUS stent was based on the platform of Boston Scientific's bare metal Express2 stent.  Unlike bare metal stents, drug-eluting stents (also called "coated" or "medicated" stents) slowly release drugs into a patient's arteries to ease complications associated with stent implantation.  Both the Express2 stent and the TAXUS stent were designed to be implanted by means of a balloon dilation catheter, which uses a tiny balloon to inflate a patient's artery before the stent is inserted.

The TAXUS stent debuted in Europe in January 2003.  According to PERS, Boston Scientific faced "tremendous pressure" to introduce the TAXUS stent to the United States, because the company was losing market share to a rival stent producer.  To increase anticipation for the U.S. release of the TAXUS stent, defendants provided a "drum roll" for the investment community leading up to its FDA approval, publicly announcing every positive step and downplaying any bad news.  For example, defendants delayed disclosing to the market a Major Deficiency letter Boston Scientific received from the FDA in September 2003.

During the course of 2003, Boston Scientific received approximately 30 complaints from physicians in Europe and other countries regarding the TAXUS stent.  These doctors reported that in some cases the balloon used to implant the stent would deflate too slowly or would not deflate at all, leading to complications for the patient.  According to PERS, Boston Scientific soon determined that these "no deflate" incidents were attributable to a manufacturing problem with the TAXUS stent known as "focal necking" or "focal neckdown."  Focal neckdown occurs when the balloon and catheter are welded together too tightly, thereby impeding deflation of the balloon after implantation.

In May 2003, Boston Scientific officers had "detailed discussions" about "the scope of any potential recall" as a result of the focal neckdown problem.  By June 2003, the company considered the "no deflate" issue to be "urgent."  During this time, Boston Scientific began "corrective action efforts" in several of its facilities, retraining operators who assembled the stents and conducting tests to predict when particular batches of inventory would be susceptible to focal neckdown.

According to PERS, despite Boston Scientific's discovery of the root cause of the "no deflate" problem, the company decided to defer making any necessary manufacturing fixes to the TAXUS stent until *after* receiving FDA approval, so as not to risk delaying its anticipated U.S. launch.  In the meantime, Boston Scientific continued to expand its inventory of TAXUS stents by producing stents according to the original, flawed manufacturing process.

On November 20, 2003, the TAXUS stent reached a major milestone in the FDA approval process, receiving "panel approval" from a group of doctors.  Boston Scientific immediately issued a press release announcing this achievement.  The press release did not, however, disclose defendants' knowledge of the "no deflate" complaints from international physicians

---

1.  This factual discussion is drawn from plaintiff's Second Consolidated Amended Complaint, which is now the operative pleading in this case, and from exhibits submitted in connection with the class certification order.

nor their knowledge of the need for a manufacturing fix to solve the focal neck-down problem.[2]

On March 4, 2004, the FDA approved the TAXUS stent for marketing and distribution in the United States. Shortly after the launch of the product in the United States, U.S. doctors began reporting "no deflate" incidents. In Boston Scientific's Form 10–Q for the First Quarter of 2004—filed May 7, 2004—the company acknowledged that it was "reviewing a limited number of reports related to balloon withdrawal difficulty during TAXUS angioplasty procedures," but the company did not disclose or discuss the possibility of a future manufacturing change. During the company's First Quarter earnings call with analysts, Boston Scientific downplayed the "no deflate" issue, emphasizing that there was "an extremely low complaint rate" and attributing the problem to doctor unfamiliarity with the device rather than to the stent's manufacturing process.

On April 4, 2004, approximately one month after the U.S. launch, Boston Scientific submitted its proposed manufacturing fix to the FDA. On May 5, 2004, the FDA approved the change. When the Boston Globe reported on this development two days later, defendants reiterated that the "no deflate" problems were probably the result of physician unfamiliarity and claimed that the manufacturing change would not affect company earnings nor "lead to a recall of any of the thousands of TAXUS packages that had been shipped but not implanted." Defendants repeated both of these contentions in a June 22, 2004 DowJones.com article, assuring investors that the "no deflate" problems would diminish as doctors grew more accustomed to the stent and that "[t]here won't be a

recall." Meanwhile, in the months following the U.S. launch of the TAXUS stent, Boston Scientific's stock price rose to its all-time high on the New York Stock Exchange ("NYSE"), and individual defendants began to sell large quantities of their own stock.

On July 2, 2004, Boston Scientific announced it was voluntarily recalling two lots of TAXUS stents (approximately 200 stents) that had not yet been implanted in patients. In a press release announcing the recall, the company explained that the FDA had received reports of one death and 16 serious injuries associated with balloon deflation problems, as well as eight reports of balloon malfunctions that had not led to injuries. Boston Scientific further noted that it had received complaints of 30 cases worldwide where the TAXUS stent balloons "did not deflate or were slow to deflate," and acknowledged the "complaint had been there historically." In a conference call with analysts on the day of the recall, defendants offered assurances that the problem was limited to "2 batches out of 1200" and asserted that "[t]he current and future production are not expected to experience similar balloon deflation problems." Defendants also revealed during the conference call that the manufacturing change approved in May 2004 had been in process before the U.S. launch of the stent. Defendants claimed it was "not a fix that [was] being made in response to the TAXUS launch or the TAXUS complaints," but "would have been submitted whether [Boston Scientific] got a complaint or not."

On July 16, 2004, two weeks after the initial limited recall, Boston Scientific halted trading on its stock shares and an-

---

**2.** The Boston Scientific press release on November 20, 2003, marks the beginning of PERS's proposed Class Period.

nounced an expanded recall of 85,000 TAXUS stents and 11,000 Express2 bare metal stents. The company acknowledged that in addition to the injuries caused by the TAXUS stent, similar "no deflate" problems with the Express2 stent had caused two deaths and 25 serious injuries. After trading resumed later on July 16, the price of Boston Scientific stock proceeded to drop 14.3% over the next three trading days. On August 4, 2004, Boston Scientific announced a further recall of an additional 3,000 TAXUS stents, bringing the total number of recalled stents to over 99,000, including 100% of the non-implanted inventory that had been produced prior to the manufacturing change.

### C. Procedural History

On February 15, 2006, several related securities fraud cases against Boston Scientific were consolidated into a single case before Judge Tauro. In connection with the consolidation, Judge Tauro approved PERS's motion for appointment as Lead Plaintiff and also approved PERS's selection of the firm Zimmerman Reed, PLLP, as Lead Counsel. On April 17, 2006, PERS filed a consolidated amended complaint, alleging defendants had made false and misleading statements in connection with four subjects: a civil lawsuit with Medinol Ltd., a Department of Justice investigation into a 1998 product recall, the introduction and subsequent recall of the TAXUS stents, and FDA investigations and warnings regarding Boston Scientific's plants.

On March 30, 2007, Judge Tauro granted defendants' motion to dismiss the complaint in its entirety. *In re Boston Scientific Corp. Sec. Litig.*, 490 F.Supp.2d 142 (D.Mass.2007). PERS filed an appeal limited to the TAXUS stent claims, and on April 17, 2008, the First Circuit reversed dismissal with regard to those claims and remanded the case to this court. *Miss. Pub. Employees' Ret. Sys. v. Boston Scientific Corp.*, 523 F.3d 75 (1st Cir.2008). The case was then reassigned to my session. On November 7, 2008, pursuant to a court order, PERS filed a proposed Second Consolidated Amended Complaint, removing allegations that had been dismissed and refining their remaining allegations in light of ongoing discovery efforts.

## II. DISCUSSION

### A. Class Certification Standard

Lead Plaintiff PERS seeks to certify the following class:

All those who purchased or otherwise acquired the equity securities of Boston Scientific Corporation between November 20, 2003, through July 15, 2004, both dates inclusive, and who were damaged thereby. Excluded from the Class are Defendants herein, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

PERS also seeks to be appointed Class Representative, and to have Lead Counsel Zimmerman Reed, PLLP, appointed to serve as Class Counsel, pursuant to Fed. R.Civ.P. 23(g).

In order for a class to be certified, a plaintiff must satisfy the four prerequisites of Fed.R.Civ.P. 23(a)—numerosity, commonality, typicality, and adequacy[3]—as

---

**3.** Under Fed.R.Civ.P. 23(a), "[o]ne or more members of a class may sue or be sued as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims

well as one of the categories of requirements of Fed.R.Civ.P. 23(b). *See Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 38 (1st Cir.2003) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)). Because PERS seeks class certification under Rule 23(b)(3), it must show "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3).[4] Defendants' only express objection to class certification is that PERS has failed to meet the "predominance" requirement of Rule 23(b)(3). In particular, defendants argue that the fraud-on-the-market theory—which would obviate the need for an individualized showing of reliance by class members—is inapplicable under the circumstances of this case.

The First Circuit has indicated that "[t]he class certification prerequisites should be construed in light of the underlying objectives of class actions." *Smilow*, 323 F.3d at 41. In this respect, the "core purpose" of Rule 23(b)(3) is "to vindicate the claims of consumers and other groups of people whose individual claims would be too small to warrant litigation." *Id.* Courts have recognized that class actions may be particularly appropriate in the context of securities litigation. *See, e.g., Priest v. Zayre*, 118 F.R.D. 552, 553–554 (D.Mass.1988) ("Courts have expressed a general preference for class certification in

securities fraud cases based on a policy favoring enforcement of the federal securities laws and recognition of the fact that class actions may be the only practicable means of enforcing investors' rights.") (internal citations omitted); *see also Kirby v. Cullinet Software, Inc.*, 116 F.R.D. 303, 311 (D.Mass.1987) ("In securities fraud cases, the class action device has been deemed especially appropriate, and even 'indispensable' to protect the small claimants who would otherwise as a practical matter be denied relief.")

### B. Level of Inquiry

Before certifying a class, "[a] district court must conduct a rigorous analysis of the prerequisites established by Rule 23." *Smilow*, 323 F.3d at 38. The First Circuit has explained that "class action machinery is expensive and in our view a court has the power to test disputed premises early on if and when the class action would be proper on one premise but not another." *Tardiff v. Knox County*, 365 F.3d 1, 4–5 (1st Cir.2004). In a securities fraud action where the plaintiff has invoked the fraud-on-the-market theory, as in this case, the district court is "entitled to look beyond the pleadings in its evaluation of the applicability of the fraud-on-the-market presumption of reliance, and its resolution of the class-certification question." *In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 6 (1st Cir.2005). The First Circuit has cautioned, however, that a court must not turn the class-certification proceeding into an unwieldy trial on the merits. *See id.* at 17. The district

---

or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."

4. Fed.R.Civ.P. 23(b)(3) further explains that "[t]he matters pertinent to these findings include: (A) the class members' interests in individually controlling the prosecution or de-

fense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action."

court's inquiry into the merits at the class certification stage should only be conducted "to the extent that the merits overlap the Rule 23 criteria." *In re New Motor Vehicles Can. Export Antitrust Litig.*, 522 F.3d 6, 24 (1st Cir.2008).[5]

### C. *Rule 23(a) Requirements*

In accordance with the First Circuit's instruction in *Smilow* to conduct a "rigorous analysis" of the prerequisites to class certification, I will consider each of Rule 23(a)'s requirements, although defendants have not expressly challenged them in this case.

#### 1. *Numerosity*

The numerosity requirement of Rule 23(a) is satisfied when the class is "so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). PERS seeks to represent a class of all those who acquired Boston Scientific's securities during the Class Period and were damaged as a result. Although PERS has not identified the exact number of purchasers who would qualify for this class, "courts may draw reasonable inferences from the facts presented to find the requisite numerosity." *McCuin v. Sec'y of Health & Human Servs.*, 817 F.2d 161, 167 (1st Cir.1987). PERS has presented evidence that during the proposed Class Period, the average weekly trading volume of Boston Scientific securities was approximately 22.3 million shares, with over 800 million shares issued and outstanding. I find this evidence sufficient reasonably to infer that the proposed class is so large that joinder would be impracticable. *See Grace v. Perception Tech. Corp.*, 128

F.R.D. 165, 167 (D.Mass.1989) ("Even if the number of persons who bought stock during the class period is unknown, numerosity can be assumed where the number of shares traded is so great that common sense dictates the class is very large.").

#### 2. *Commonality*

The commonality requirement is met where "there are questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). It is relatively easy for a plaintiff to show commonality because "[a] *single* common legal or factual issue can suffice" to satisfy the requirement. *Payne v. Goodyear Tire & Rubber Co.*, 216 F.R.D. 21, 25 (D.Mass.2003) (emphasis in original). Furthermore, where certification of the proposed class depends on the plaintiff's satisfaction of Rule 23(b)(3)'s more stringent requirement that common questions of law or fact predominate over individual ones, the commonality requirement of Rule 23(a) may be considered "largely irrelevant." *Grace*, 128 F.R.D. at 167. In this case, PERS has identified a number of common questions, including whether defendants made material misleading statements or omissions, whether defendants acted with the requisite scienter, and whether the proposed class is entitled to a presumption of reliance under the fraud-on-the-market theory. I therefore find the commonality requirement has been met.

#### 3. *Typicality*

The typicality requirement is satisfied where "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed.R.Civ.P.

---

5. Different Circuit Courts have articulated different standards for the appropriate level of inquiry into the merits at the class certification stage. *See In re New Motor Vehicles Can. Export Antitrust Litig.*, 522 F.3d 6, 24–25 (1st Cir.2008) (collecting cases). Although full discussion of these different formulations is not necessary for purposes of this Memorandum and Order, I will address, in section II.D.1.b, *infra*, authority from the Fifth and Second Circuits concerning whether a district court should consider evidence of market impact where class certification is based on the fraud-on-the-market theory.

23(a)(3). The plaintiff can meet this requirement by showing that its injuries arise from the same events or course of conduct as do the injuries of the class, and that its claims are based on the same legal theory as those of the class. *See In re Credit Suisse–AOL Sec. Litig.*, 253 F.R.D. 17, 23 (D.Mass.2008). The typicality inquiry "is designed to align the interests of the class and the class representatives so that the latter will work to benefit the entire class through the pursuit of their own goals." *In re Prudential Ins. Co. Am. Sales Litig.*, 148 F.3d 283, 311 (3d Cir. 1998). In this case, the claims of PERS and the claims of the proposed class are based on the same legal theory and fact pattern. PERS, like the other proposed class members, purchased Boston Scientific stock at a time when the price was alleged to have been artificially inflated due to defendants' misleading statements, and was subsequently harmed by the drop in stock price after the recall on July 16, 2004. On this basis, I find the typicality requirement has been met.

### 4. Adequacy

The adequacy requirement is satisfied if "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). This entails a two-part showing: "The moving party must show first that the interests of the representative party will not conflict with the interests of the class members, and second, that counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation." *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir. 1985).

The first prong of the test seeks to ensure that the interests of the class representative are aligned with the interests of absent class members. For the same reasons that PERS's claims are "typical" of the claims of the proposed class, I find that PERS's interests would not conflict with the interests of other class members. *Cf. In re Credit–Suisse*, 253 F.R.D. at 22–23 (noting that the requirements of typicality and adequacy "tend to merge"). I also find, as did Judge Tauro, that the counsel selected by PERS—the law firm of Zimmerman Reed, PLLP—is sufficiently experienced with complex securities litigation to capably conduct the proposed litigation. For these reasons, I find the adequacy requirement has been met.

### D. Rule 23(b)(3) Requirements

PERS seeks class certification under Fed.R.Civ.P. 23(b)(3), and must therefore satisfy that provision's requirements of predominance and superiority.

#### 1. Predominance

The predominance prong requires "that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed.R.Civ.P. 23(b)(3). In making an inquiry concerning predominance, "a district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case." *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 298 (1st Cir.2000).

■ In order to prevail on the merits, PERS must ultimately demonstrate each of the basic elements of a securities fraud action under § 10(b) of the Securities Exchange Act. As formulated by the Supreme Court, these elements are: (1) a material misrepresentation or omission; (2) scienter, i.e., a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance, often referred to in cases involving public securities markets as "transaction causation"; (5) economic loss; and (6) loss causation, i.e., a

causal connection between the material misrepresentation and the loss. *See Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 341–42, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). Most of these elements are generally amenable to common proof; reliance, by contrast, is typically proven on an individual basis. *See PolyMedica,* 432 F.3d at 7. Imposing a universal rule of individualized proof of reliance, however, "would effectively foreclose securities fraud class actions because individual questions of reliance would inevitably overwhelm the common ones under Rule 23(b)(3)." *Id.*

To avoid this result, courts have recognized the so-called "fraud-on-the-market theory," which relieves the plaintiff from the burden of proving individualized reliance by class members. *See id.* Where the theory is applicable, the plaintiff may rely on a rebuttable presumption that class members relied on the "integrity of the market price," which was itself influenced by the defendant's misleading statements. *See id.* The Supreme Court first recognized the fraud-on-the-market theory in *Basic Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), where it explained that the theory "is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business." *Id.* at 241, 108 S.Ct. 978 (quoting *Peil v. Speiser,* 806 F.2d 1154, 1160 (3d Cir.1986)). The First Circuit elaborated on the theory's rationale in *Shaw v. Digital Equip. Corp.,* 82 F.3d 1194 (1st Cir.1996):

> [I]n cases involving a fraud-on-the-market theory of liability ... the statements identified by plaintiffs as actionably misleading are alleged to have caused injury, if at all, not through the plaintiffs' direct reliance upon them, but by dint of the statements' inflating effect on the market price of the security purchased.

> When the truth is disclosed and the market self-corrects, investors who bought at the inflated price suffer losses. Those losses can be deemed to have been caused by the defendants' statements, even absent direct reliance by plaintiffs, because the statements were presumptively absorbed into and reflected by the security's price.

*Id.* at 1218 (internal citations omitted).

In order to rely on the fraud-on-the-market presumption of reliance, PERS must first demonstrate that the market for Boston Scientific's stock was "efficient," meaning that it "fully reflect[ed] all publicly available information." *PolyMedica,* 432 F.3d at 10. As the First Circuit has explained, "when a market lacks efficiency, there is no assurance that the market price was affected by the defendant's alleged misstatement at all. Instead, the price may reflect information wholly unrelated to the misstatement." *Id.* at 8. Defendants do not dispute that the market at issue in this case was efficient. Rather, they argue that to invoke the fraud-on-the-market presumption, PERS must *also* show that an alleged misstatement or the subsequent corrective disclosure of the truth affected the stock's price in a statistically significant manner. To provide full context, I will address the issues of market efficiency and evidence of market impact in turn.

### a. Market Efficiency

In the First Circuit, a market is deemed efficient for purposes of the fraud-on-the-market theory if it is "informationally efficient." *PolyMedica,* 432 F.3d at 16. This means that market prices "respond so quickly to new information that it is impossible for traders to make trading profits on the basis of that information." *Id.* at 14 (internal quotation omitted). It is not necessary for the market at issue also

to have "fundamental value efficiency," which is found where "market prices mirror the best possible estimates ... of the actual economic values of securities in terms of their expected risks and returns." *Id.* at 15 (internal quotations omitted).

In evaluating whether the market for a particular security is efficient, the First Circuit relies on the factors enumerated in *Cammer v. Bloom,* 711 F.Supp. 1264 (D.N.J.1989). *See In re Xcelera.com Sec. Litig.,* 430 F.3d 503, 511 (1st Cir. 2005). The *Cammer* factors are: (1) the stock's average trading volume; (2) the number of securities analysts that followed and reported on the stock; (3) the presence of market makers and arbitrageurs; (4) the company's eligibility to file a Form S–3 Registration Statement;[6] and (5) a cause-and-effect relationship, over time, between unexpected corporate events or financial releases and an immediate response in stock price. *See id.* (citing *Cammer,* 711 F.Supp. at 1286–87).

PERS has provided sufficient evidence to satisfy all of the *Cammer* factors. First, during the Class Period, Boston Scientific stock was actively traded on the NYSE and had over 800 million shares issued and outstanding. The average weekly trading volume was approximately 22.3 million shares. Second, during the Class Period there were more than 180 analyst reports on Boston Scientific stock from at least 17 different investment firms. Third, in accordance with the standard practice for securities listed on the NYSE, Boston Scientific stocks were assigned to a specialist who acted as a market maker, facilitating a high level of trading. Further, there were no impediments to arbitrage activity and short selling of Boston Scientific stock. Fourth, Boston Scientific met the SEC eligibility requirements to file a Form S–3. Fifth, and most importantly, PERS's expert demonstrated in her report that during the Class Period Boston Scientific's stock price changed quickly in response to new information, such as company announcements. On the basis of these factors,[7] I find the market for Boston Scientific securities was efficient for purposes of the fraud-on-the-market theory.

b. Evidence of Market Impact

Defendants argue the fraud-on-the-market theory is not applicable in this case because evidence shows that neither their allegedly misleading statements nor the subsequent disclosure of the "truth" affected the market price of Boston Scientific stock in a statistically significant manner. While this argument does implicate PERS's ability to prove loss causation, an essential element in a securities fraud action, I find that this does not bear on Rule 23(b)(3)'s requirement that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed.R.Civ.P. 23(b)(3).

Defendants contend that the "truth" they allegedly concealed during the Class Period was already disclosed and known to the market prior to the end of the Class Period on July 15, 2004. In support of this

**6.** Companies permitted by the SEC to file an S–3 Registration Statement are those which meet at least a $75 million market capitalization requirement and have filed reports with the SEC for twelve consecutive months. *See In re Xcelera.com Sec. Litig.,* 430 F.3d 503, 511 n. 9 (1st Cir.2005) (citing 17 C.F.R. § 239.13 (2003)).

**7.** Although the First Circuit has noted that the *Cammer* factors are not exhaustive, *see Xcelera.com,* 430 F.3d at 511, I find there is no need to look beyond them in this case because defendants do not dispute that the market for Boston Scientific stock during the Class Period was efficient.

claim, defendants note that Boston Scientific had openly acknowledged the existence of "no deflate" complaints from the European launch of the TAXUS stent by April 20, 2004, during the company's First Quarter earnings call with analysts. Defendants also note that information concerning Boston Scientific's focal neckdown manufacturing change was publicly available and reported by analysts as early as May 2004. Defendants claim that at the very latest, the entirety of what they had allegedly concealed regarding the "no deflate" problems and the subsequent manufacturing fix was revealed to the public during an analyst call on July 2, 2004, following the first recall of two lots of TAXUS stents. Relying on the detailed financial analysis submitted by PERS's expert, defendants argue that none of these disclosures during the Class Period had any statistically significant impact on the market price of Boston Scientific stock. According to defendants, the 14% drop in stock price after the expanded July 16, 2004 recall was based on the company's announcement that it expected disruption in its ability to satisfy international demand going forward and its plans to postpone releasing second quarter financial results, which they contend were disclosures having nothing to do with the TAXUS non-deflate complaints or the Taxus manufacturing change.

Defendants cite authority from two circuits to support their position that the fraud-on-the-market theory is unavailable where evidence shows the market did not react to an alleged misstatement or disclosure of the "truth." Defendants primarily rely on authority from the Fifth Circuit, which "require[s] proof that the [defendant's] misstatement *actually moved* the market" before invoking the fraud-on-the-market theory. *Oscar Private Equity Invs., Inc. v. Allegiance Telecom, Inc.,* 487 F.3d 261, 265 (5th Cir.2007) (emphasis in original). The Fifth Circuit apparently considers such proof to be essential for justifying the presumption that class members indirectly relied on a defendant's statement: "If the market price was not *actually* affected by the statement, reliance on the market price does not *of itself* become reliance on the statement." *Nathenson v. Zonagen Inc.,* 267 F.3d 400, 419 (5th Cir.2001) (emphasis in original).[8] Furthermore, the Fifth Circuit has emphasized that "plaintiffs cannot trigger the presumption of reliance by simply offering evidence of any decrease in price following the release of negative information." *Greenberg v. Crossroads Sys., Inc.,* 364 F.3d 657, 665 (5th Cir.2004). Rather, "[t]o raise an inference through a decline in stock price that an earlier false, positive statement actually affected a stock's price, the plaintiffs must show that the false statement causing the increase was related to the statement causing the decrease." *Id.* Defendants seek to apply the Fifth Circuit's approach to the present case and argue that PERS has failed to demonstrate the July 16, 2004 drop in Boston Scientific stock price was caused by the disclosure of any new information concerning the "no deflate" complaints or the focal neckdown manufacturing fix. Accordingly, defendants claim, the fraud-on-the-market theory should not be triggered, and class certification should be denied.

8. Although the court in *Nathenson v. Zonagen Inc.,* 267 F.3d 400 (5th Cir.2001), frames its analysis in terms of reliance, the Fifth Circuit acknowledged in *Oscar Private Equity Invs., Inc. v. Allegiance Telecom, Inc.* 487 F.3d 261 (5th Cir.2007), that the requirement of proving market impact more directly relates to the securities fraud element of loss causation: "Essentially, we require plaintiffs to establish loss causation in order to trigger the fraud-on-the-market presumption." *Id.* at 265.

Defendants alternatively rely on a recent case from the Second Circuit—*In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474 (2d Cir.2008)—to argue that even if the fraud-on-the-market presumption has been triggered in this case, defendants have presented sufficient evidence to rebut that presumption. The Second Circuit rejected the Fifth Circuit's rule that a plaintiff must affirmatively prove a misstatement's effect on market price at the class certification stage in order to invoke the fraud-on-the-market presumption. *Id.* at 483 ("[P]laintiffs do not bear the burden of showing an impact on price."). In reaching that conclusion, the *Salomon* court explained: "The point of *Basic* is that an effect on market price is *presumed* based on the materiality of the information and a well-developed market's ability to readily incorporate that information into the price of securities." *Id.* The court further explained that in a securities fraud action, the materiality of a particular statement is framed "in terms of how the information would be viewed by a reasonable investor, rather than in terms of actual impact on market price." *Id.* at 482.[9] The court emphasized, however, that *Basic* "made clear that *defendants* could 'rebut proof of the elements giving rise to the presumption, or show that the misrepresentation in fact did not lead to a distortion of price ....'" *Id.* at 483 (emphasis in original) (quoting *Basic*, 485 U.S. at 248, 108 S.Ct. 978). The Second Circuit held that if prior to class certification, defendants could show "the absence of a price impact," the fraud-on-the-market presumption would be deemed rebutted, and class certification would fail. *Id.* at 484.

Recent First Circuit authority indicates that evaluation of evidence of market impact at the class certification stage should differ from the approaches of the Fifth Circuit and Second Circuit. In *In re New Motor Vehicles Can. Export Antitrust Litig.*, the First Circuit noted that the various Circuit Courts have each adopted different formulations as to the necessary degree of inquiry at the class certification stage and described the Second and Fifth Circuits as "around the more rigorous end of this spectrum." 522 F.3d at 24. The First Circuit indicated that in a securities fraud class certification, the district court should merely "probe the factual basis of the fraud-on-the-market presumption to make sure it will be a viable form of proof in a given case." *Id.* at 25. This is consistent with the principle that a district court deciding class certification should inquire into the merits of a case only "to the extent that the merits overlap the Rule 23 criteria." *Id.* at 24. A plaintiff seeking class certification in the First Circuit need only "present 'basic facts' that the fraud-on-the-market presumption could be invoked," while the theory's *actual* applicability should be resolved on summary judgment or at trial. *Id.* at 25 (quoting *PolyMedica*, 432 F.3d at 19). These "basic facts" should be sufficient for the court to "determine whether the fraud-on-the-market theory was reasonably applicable, specifically whether ... the market was efficient." *Id.*[10]

---

9. In *Basic Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), the Supreme Court adopted the following definition of "materiality" in a securities fraud action: "[T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* at 231–32,

108 S.Ct. 978 (internal quotation omitted); *see also Nathenson*, 267 F.3d at 418 ("Materiality thus looks to likely potential. Reliance, on the other hand, ultimately looks to what *actually* happened.") (emphasis in original).

10. *In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 17 (1st Cir.2005) approvingly quoted *Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491,

A recent opinion by my colleague Judge Gertner specifically addressed the proper treatment of evidence of market impact in a securities fraud class certification. *See In re Credit–Suisse*, 253 F.R.D. 17. There, the defendants argued that because the case involved allegedly misleading statements by market analysts—rather than by the stock issuers themselves—the court should require the plaintiff affirmatively to demonstrate the market impact of the statements before invoking the fraud-on-the-market presumption. *Id.* at 28. Judge Gertner rejected the need for any such requirement, noting that "the First Circuit made clear in *New Motor Vehicles* [that] the scope of the Court's 'searching inquiry' at the class certification stage is limited to the requirements of Rule 23." *Id.* at 30 (citing *New Motor Vehicles*, 522 F.3d at 24). She further explained:

> The Court's sole concern at class certification is whether plaintiff's claims are properly amenable to class action treatment, and, in particular, whether common legal and factual questions predominate over individual ones.... Whether plaintiff's evidence has raised triable issues of fact is a question for summary judgment. Defendants' arguments regarding market impact, while certainly not insubstantial, do not address the purposes of Rule 23.

*Id.* I find the reasoning of *In re Credit–Suisse* persuasive in light of the development of First Circuit case law. Indeed, several years earlier, I expressed similar views in another securities fraud action involving statements by market analysts. *See Swack v. Credit Suisse First Boston*, 230 F.R.D. 250, 272 (D.Mass.2005) (concluding that defendants who argued for a

requirement of demonstrating market impact at the class certification stage "conflate the consideration of the merits with the 23(b)(3) predominance analysis.").

I find that by demonstrating the market for Boston Scientific securities was efficient during the Class Period, PERS has adequately shown that the fraud-on-the-market theory will provide a viable form of proof in this case. Although defendants have raised colorable arguments regarding PERS's ability to prove loss causation, those issues are more properly addressed on summary judgment or at trial. *Cf. DeMarco v. Robertson Stephens Inc.*, 228 F.R.D. 468, 475 (S.D.N.Y.2005) ("[T]he existence of this dispute, however heated, does not demonstrate that individual issues will predominate over common ones."). It is sufficient at this stage to conclude that the issues raised by defendants—e.g., when the information they allegedly concealed was actually disclosed to the market, and what market impact that disclosure generated—are fully susceptible of common proof. For these reasons, I find that PERS has satisfied the predominance requirement of Rule 23(b)(3).

## 2. Superiority

The superiority prong requires "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). Given the size of the proposed class in this case, it is clear that piecemeal adjudication of claims covering substantially similar issues would be an inefficient allocation of court resources. Class certification in this case is also superior to other methods because, in accordance with the

---

505 n. 16 (S.D.Tex.2004) for the proposition that "[a]t [the class-certification] stage of the proceedings, the Court need only inquire whether the stock traded in an efficient market and not examine the merits of the

case.... Thus, the Court will not address whether Defendants' [sic] can rebut the presumption of reliance." (alterations in original).

"core purpose" of Rule 23(b)(3), it will provide the opportunity for individual investors to vindicate potentially valid claims, even where those investors suffered relatively small damages and have insufficient resources to pursue litigation on their own. For these reasons, I find that a class action is superior to other methods for the "fair and efficient" resolution of the case.

### III.  CONCLUSION

For the reasons set forth more fully above, I GRANT class certification of the proposed class and appoint Lead Plaintiff PERS to be Class Representative, and Lead Counsel Zimmerman Reed, PLLP, to be Class Counsel.