**In re RED HAT, INC. SECURITIES LITIGATION.**

No. 5:04–CV–473–BR.

United States District Court,
E.D. North Carolina,
Western Division.

Aug. 28, 2009.

Rufus L. Edmisten, William W. Webb, Sr., Edmisten & Webb Law Firm, Raleigh, NC, for John Borsellino, Union Group.

L. Bruce McDaniel, McDaniel & Anderson, LLP, Raleigh, NC, for Charles Gilbert.

Brandon S. Neuman, Shanahan Law Group, for Eric W. Bushman, Steve Salek.

Nigle B. Barrow, Jr., Raleigh, NC, for Brockton Contributory Retirement System.

Christopher W. Jones, Pressly M. Millen, Womble Carlyle Sandridge & Rice, PLLC, Raleigh, NC, for Red Hat, Inc., Matthew J. Szulik, Kevin B. Thompson.

### ORDER

W. EARL BRITT, Senior District Judge.

This matter is before the court on the 14 January 2008 motion of plaintiff Charles Gilbert as the proposed class representative for class certification pursuant to Fed.R.Civ.P. 23. On 16 July 2008, the remaining defendants, Red Hat, Inc. ("Red Hat"), Matthew Szulik, and Kevin Thompson, filed a response in opposition with supporting documentation.[1] On 4 August 2008, Gilbert filed a reply with further supporting materials. In response, on 11 September 2008, defendants moved to exclude portions of Gilbert's rebuttal expert report. Gilbert filed a memorandum in opposition, and defendants replied. On 22 December 2008, Gilbert filed a motion to exclude defendants' expert report and supplemental expert report, to which defendants filed an opposition brief, and Gilbert replied on 19 February 2009. Defendants then filed a suggestion of subsequently decided authority on 21 April 2009.

### I. BACKGROUND

As the court has recognized in prior orders, this action is a consolidation of multiple

---

1. Briefing was delayed due to resolution of Gilbert's motion for a protective order and defendants' motion for extension of time to respond to the motion for class certification.

proposed securities fraud class action suits filed in this district. Via the Consolidated Amended Class Action Complaint filed 6 May 2005, plaintiffs assert claims under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (and Rule 10b–5, 17 C.F.R. § 240.10b–5, thereunder), against Red Hat, its CEO Szulik, and its former CFO Thompson; and under Section 20(a) of that Act, 15 U.S.C. § 78t(a), against Szulik and Thompson.[2] As Gilbert summarizes:

The Complaint alleges that during the Class Period, [17 December 2002 through 12 July 2004,] Defendants improperly recognized revenue [for software subscriptions] before it was earned, and then used the backdated revenue to issue false financial reports to Red Hat investors. Additionally, the Complaint alleges that during the Class Period, Defendants knowingly or recklessly made material misrepresentations and/or failed to disclose material facts to the investing public.

Specifically, Plaintiff alleges that Defendants improperly recognized revenue in violation of the applicable accounting rules and standards.... Moreover, the Complaint alleges that Defendants misled investors during the Class Period by making numerous public statements stating that Red Hat was deferring revenue ratably over the period of its subscriptions, when, in fact, it was secretly recognizing revenue before these subscriptions had begun and backdating revenue to the beginning of each monthly period. Indeed, Plaintiff alleges that as a result of these improper accounting practices, Defendants' financial statements were materially inflated.

(Mot. Cert. at 1–2 (footnote and citations omitted).)

Initially, plaintiffs Steve Salek and Eric Bushman sought to certify the class. In May 2007, the court denied their motion to certify, finding Salek and Bushman inadequate class representatives. Subsequently Gilbert renewed his motion to be appointed lead plain-

tiff.[3] In November 2007, the court appointed Gilbert as Lead Plaintiff and set anew the discovery and briefing schedule for class certification.

Gilbert seeks to represent a class composed of

all purchasers of the common stock of Red Hat ... between December 17, 2002 and July 12, 2004, inclusive and who were damaged thereby (the "Class")....

Excluded from the Class are Defendants Red Hat, [Szulik], and [Thompson] (collectively, "Defendants"), any entity in which Defendants or any excluded person has or had a controlling interest, the officers and directors of Red Hat, and the legal affiliates, representatives, heirs, controlling persons, successors, and predecessors in interest or assigns of any such excluded party.

(Mot. Cert. at 1.)

The proposed class period ends on the day prior to Red Hat's public announcement that the company planned to restate its audited financial statements for the fiscal years ended 28 February 2002, 28 February 2003, and 29 February 2004, and its unaudited financial statements for fiscal quarter ended 31 May 2004. (*See* Consol. Am. Compl. ¶ 99; Ans. ¶ 99.) "The company said that the restatement was due to the correction in the manner in which the Company recognizes revenue for certain subscription agreements." (Consol. Am. Compl. ¶ 99; *see also* Ans. ¶ 99.) Specifically, Red Hat explained, " '[I]t would be appropriate to stop recognizing revenue for subscription agreements on a monthly basis—a method [the company] has consistently applied for the last five years—and start recognizing revenue on a daily basis over the particular contract term.' " (Consol. Am. Compl. ¶ 99 (quoting 13 July 2004 press release); *see also* Ans. ¶ 99.)

## II. DISCUSSION

It is well settled that the plaintiff seeking to represent the class bears the burden of

---

**2.** On 12 May 2006, the court dismissed plaintiffs' Sarbanes–Oxley Act of 2002 claim and dismissed all claims against other Red Hat officers and PricewaterhouseCoopers LLP.

**3.** In September 2004, Gilbert filed his initial motion for appointment as lead plaintiff. However, he later withdrew that motion, and the court appointed the "Union Group" as lead plaintiff, of which Salek and Bushman were members.

showing that the requirements of Federal Rule of Civil Procedure 23 are met. *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 362 (4th Cir.2004). "Every class action must satisfy the four requirements of Rule 23(a)—numerosity, typicality, commonality, and adequacy of representation...." *Id.* (citation omitted). That is, respectively,

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> > (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a).

Also, the action must meet one of the alternative requirements of Rule 23(b). *Gariety*, 368 F.3d at 362. Here, Gilbert is proceeding under Rule 23(b)(3) "which requires the court to find (1) that 'questions of law or fact common to the members of the class predominate over any questions affecting only individual members' (the predominance requirement), and (2) that 'a class action is superior to other available methods for the fair and efficient adjudication of the controversy' (the superiority requirement)." Pertinent to the court's determination of whether these requirements are met are:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed.R.Civ.P. 23(b)(3).

Securities litigation is particularly well suited to class action treatment. *In re BearingPoint, Inc. Sec. Lit.*, 232 F.R.D. 534, 542 (E.D.Va.2006). Despite the recognition that Rule 23 should be given a "liberal rather than restrictive construction," *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 424 (4th Cir.2003), *cert. denied*, 542 U.S. 915, 124 S.Ct. 2837, 159 L.Ed.2d 287 (2004), the court must nonetheless "conduct a 'rigorous analysis,'" *Thorn v. Jefferson–Pilot Life Ins. Co.*, 445 F.3d 311, 318 & n. 8 (4th Cir.2006). The court is not required to accept the complaint's allegations in resolving a motion for class certification. *Gariety*, 368 F.3d at 366. To determine whether the requirements of Rule 23 are met, the court may very well make findings which overlap with the merits of the case. This practice is entirely permissible. *See id.* ("Before deciding whether to allow a case to proceed as a class action ... a judge should make whatever factual and legal inquiries are necessary under Rule 23.... And if some of the considerations under Rule 23(b)(3) ... overlap the merits ... then the judge must make a preliminary inquiry into the merits.") (quoting *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 675–76 (7th Cir.2001)).

With all these principles in mind, the court turns to the issues at hand. Defendants do not challenge the court's previous findings that the numerosity and commonality requirements of Rule 23(a), (*see* 5/11/07 Order at 4–5), and the superiority requirement of Rule 23(b)(3), (*id.* at 6–7), are met. Also, defendants do not explicitly contest that Gilbert has sufficiently shown that his claims are typical of the class. Gilbert purchased shares of Red Hat stock within the class period, (7/13/07 McDaniel Decl., Ex. A), and contends he suffered losses due to defendants' wrongful and premature recognition of revenue, (*see* Mugmon Aff. (DE # 167), Ex. K at 76, 79). As such, Gilbert has demonstrated that he is part of the proposed class and that he possesses the same interest and suffers the same injury as the class, and typicality is thus satisfied, *see Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 146 (4th Cir.2001). Defendants do, however, challenge Gilbert's adequacy as the class representative and whether the predominance requirement of Rule 23(b)(3) is satisfied. The court will discuss adequacy and predomi-

nance in turn.[4]

## A. *Adequacy of Representation*

■ As recognized previously, Rule 23(a) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4).

> "This requirement has two aspects: whether the named representative will vigorously prosecute the action through qualified counsel [5] and whether the class representatives have conflicting interests with the unnamed class members." [*Simpson v. Specialty Retail Concepts,* 149 F.R.D. 94, 102 (M.D.N.C.1993) ] (citation omitted); *see also Pearce v. PaineWebber, Inc.,* No. 3:02–2409–17, 2004 WL 5282962, *7 (D.S.C. Aug. 13, 2004) ("Generally, to satisfy Rule 23(a)(4), (1) counsel must be qualified, experienced, and generally able to conduct the proposed litigation; and (2) plaintiffs' claims must be sufficiently interrelated with and not antagonistic to the class claims. The principal factor in determining the adequacy of class representatives is whether the plaintiffs have the ability and commitment to prosecute the action vigorously.") (quotations, citations, and footnote omitted).

(5/11/07 Order at 9.)

■ Several factors bear on the court's assessment of the proposed representative.

The court may consider "his 'honesty, conscientiousness, and other affirmative personal qualities.' " *Shiring v. Tier Techs., Inc.,* 244 F.R.D. 307, 315 (E.D.Va.2007) (citation and footnote omitted). The representative should have at the very least a basic understanding of the facts and nature of the lawsuit. *See Gunnells,* 348 F.3d at 430 ("It is hornbook law ... that '[i]n a complex lawsuit, such as one in which the defendant's liability can be established only after a great deal of investigation and discovery by counsel against a background of legal knowledge, the representative need not have extensive knowledge of the facts of the case in order to be an adequate representative.' " (citation omitted)); *Byes v. Telecheck Recovery Servs., Inc.,* 173 F.R.D. 421, 426, 427 (E.D.La.1997). As one court has succinctly stated,

> [t]he named plaintiffs in a class action need not be the best representatives of the class, and to say that they are not expected to understand every detail of their case is to understate the matter. Still, they must be able, at minimum, to make important nondelegable decisions about the course of the litigation; also, if the named plaintiffs are evasive, untruthful, or lack credibility, this weighs heavily against them as adequate class representatives.

*Smyth v. Carter,* 168 F.R.D. 28, 33 (W.D.Va. 1996) (citation omitted).

---

4. The court agrees with defendants that despite having previously found the predominance requirement was satisfied, the court in its discretion may reconsider it now because the earlier finding was interlocutory. *See American Canoe Ass'n v. Murphy Farms, Inc.,* 326 F.3d 505, 514–15 (4th Cir.2003) (district court's power to reconsider and modify an earlier interlocutory order is committed to the discretion of the court and not limited by the law of the case doctrine). Of course, the court must examine Rule 23's typicality and adequacy requirements anew because those requirements are (proposed) class representative specific. *See* Fed.R.Civ.P. 23(a)(4) ("[T]he *representative parties* will fairly and adequately protect the interests of the class." (emphasis added)); *Tatum v. R.J. Reynolds Tobacco Co.,* 254 F.R.D. 59, 64 (M.D.N.C.2008) ("[W]hile the commonality requirement focuses on the claims of the class as a whole, the typicality requirement focuses on the named plaintiff's claim.") (citing *Broussard v. Meineke Discount Muffler Shops, Inc.,* 155 F.3d 331, 340 (4th Cir. 1998)).

5. Defendants do not contend that Gilbert's counsel, Coughlin Stoia Geller Rudman & Robbins LLP ("Coughlin Stoia"), is not qualified to conduct the litigation. Pursuant to Fed.R.Civ.P. 23(g)(1),

> [i]n appointing class counsel, the court:
> (A) must consider:
> (i) the work counsel has done in identifying or investigating potential claims in the action;
> (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
> (iii) counsel's knowledge of the applicable law; and
> (iv) the resources that counsel will commit to representing the class[.]

To date, Coughlin Stoia (and its predecessor firm) appears to have adequately prosecuted this action on behalf of the proposed class. As the court noted after having reviewed the firm's profile, the firm possesses the experience and qualification to adequately represent the class. (11/13/07 Order at 5; *see also* McDaniel Decl. (DE # 135), Ex. G.)

■ Gilbert is an attorney licensed in Maryland and West Virginia, (Mugmon Aff. (DE # 167), Ex. K at 10), although it does not appear that he is actively engaged in the practice of law. He is involved in a snow removal business and several firearms-related businesses, ones which buy and sell [6] firearms as well as operate an indoor shooting range. (Id. at 9, 11, 35, 48, 156–60.) He is a self-described "in-and-out trader and [ ] retention trader" of Red Hat stock, (Mot. Cert. at 19), who allegedly lost approximately $360,000 as a result of defendants' wrongdoing, (Mugmon Aff. (DE # 167), Ex K. at 79). In terms of his involvement in and understanding of this case, as Gilbert points out, he is familiar with the procedural history of the case; identified the alleged wrongdoing by Red Hat and its officers; knows the class period; knows his purported loss; reviewed documents before they were filed; and has communicated with counsel on a number of occasions, (see Reply at 3 n. 6, 4–5 & n. 9), which the court agrees is a vastly different situation than that of the original proposed representatives, Salek and Bushman. In addition, Gilbert swears that he

> is committed to active direction of this litigation and maximizing the recovery for the class by attending hearings, depositions and/or trial as well as overseeing the preparation and filings of pleadings, as appropriate. [He] also intends to provide fair and adequate representation to the class by working with class counsel to obtain the largest recovery for the class consistent with good faith and meritorious advocacy.

(McDaniel Decl. (DE # 135), Ex. A at 2.)

Defendants challenge Gilbert's adequacy to represent the class on a number of grounds. First, they contend that "Gilbert's inability to manage his own important affairs in compliance with the law shows that he is incapable of being a class representative." (Defs.' Mem. Opp'n at 18 (emphasis omitted).) In 2005 and 2006, prompted by hundreds of willful violations of the Gun Control Act's record keeping requirements, the ATF re-

voked the federal firearms license ("FFL") of one of Gilbert's businesses and denied an application for a FFL for another of his businesses. *American Arms Int'l, LLC v. Herbert,* Civil No. DKC 2006–2468, at 3–4 (D.Md. Feb. 19, 2008). Upon the businesses' petition, the district court upheld the ATF's decision, *id.* at 15, and, in turn, the Court of Appeals for the Fourth Circuit affirmed the judgment of the district court, 563 F.3d 78 (4th Cir.2009).

While the court will not minimize the seriousness of the violations or Gilbert's responsibility therefor as owner of the businesses, the court finds that such conduct does not implicate Gilbert's credibility to the extent the court would deem him inadequate to serve as class representative. *Compare In re Sepracor Inc. Sec. Lit.,* 233 F.R.D. 52, 56–57 (D.Mass.2005) (representative had omitted information in certification and answered interrogatory incorrectly; "[q]uestions of credibility which do not affect a plaintiff's ability to represent the class or to pursue the merits of the cause of action routinely fail to defeat class certification." (citations omitted)); *Wood v. Capital One Auto Finance, Inc.,* No. 06–CV–7, 2006 U.S. Dist. LEXIS 67513, *9–10 (E.D.Wisc. Sept. 19, 2006) (representative had prior felony conviction for dishonesty; "[i]ndeed, while some courts have rejected the appointment of convicted felons as class representatives, a felony conviction does not necessarily preclude a person from serving as a class representative." (collecting cases)), *with Zemel Family Trust v. Philips Int'l Realty Corp.,* 205 F.R.D. 434, 436–37 (S.D.N.Y.2002) (finding trustee of plaintiff trust subject to unique defenses and inadequate where he gave testimony directly contradictory to documentary evidence about his involvement in entities that were the subject of SEC sanctions); *Byes,* 173 F.R.D. at 427–28 (acknowledging that "[g]enerally unsavory character or credibility problems will not justify a finding of inadequacy unless related to the issues in the litigation," yet noting that "some courts have refused to certify classes

6. At the time of Gilbert's deposition, the businesses were engaged in buying and selling firearms. (*See* Mugmon Aff. (DE # 167), Ex. K at 156–57.) Because the firearms license for one business was revoked and the license for another was denied, which is discussed further below, the court presumes none of Gilbert's businesses may currently deal in firearms.

where the name plaintiff was guilty of prior fraudulent conduct or would be likely to present incredible testimony"; court found plaintiff inadequate based on a combination of factors, including a conviction for theft and submitting in the case an affidavit which was directly contradicted by her subsequent deposition testimony).

Next, defendants cite Gilbert's conduct in this case, specifically conduct related to the two certifications he submitted to the court in conjunction with his motions to be appointed lead plaintiff. Gilbert acknowledges that his first certification is inaccurate. (*See* Mugmon Aff. (DE # 167), Ex. K. at 60–61, 116.) As to Gilbert's second certification, the parties dispute whether it is in fact inaccurate. The court agrees, and defendants do not appear to dispute, that Gilbert's itemization of his purchases and sales of Red Hat stock during the class period (attached to his second certification) virtually mirrors the figures in the Fidelity Investments Cost Basis report. (*Compare* McDaniel Decl. (DE # 135), Ex. A, *with* Mugmon Aff. (DE # 167), Ex. R.) Defendants do, however, point out discrepancies between Gilbert's second certification and the transaction confirmations from Fidelity Investments for each of Gilbert's Red Hat trades. Defendants note that for more than 60 transactions the share price reflected on Gilbert's certification differs from the share price on the corresponding transaction confirmation. The difference is due to the commission Fidelity Investments assessed to Gilbert. On the Cost Basis report, the price per share does not include any commission, and Gilbert states just that at the conclusion of the chart documenting his losses, submitted with his renewed motion to be appointed lead plaintiff, (McDaniel Decl. (DE # 135), Ex. F). On the transaction confirmations, the price per share includes any commission. (*See* Mugmon Aff. (DE # 167), Ex. M.) While the method of accounting for the commission in the price per share will obviously influence the amount of Gilbert's claimed losses, it is obvious that Gilbert, by relying on the Cost Basis report to complete his second certification, was not trying intentionally to inflate his losses.

Defendants also show that Gilbert did not record all transactions on his second certification for which there are transaction confirmations and they show that there are not transaction confirmations for all transactions Gilbert *did* record. The court cannot discern the reason for, and Gilbert has not explained, these inconsistencies between his certification and transaction confirmations. However, again, there is not any significant discrepancy between Gilbert's second certification and the Cost Basis report. The court therefore cannot say there is a complete lack of documentary support for the certification and calculation of losses. At bottom, it is clear, whatever the reason for the inconsistencies, they were not the result of any intentional misrepresentation on the part of Gilbert. *Compare Sepracor,* 233 F.R.D. at 56 (finding plaintiff was qualified to represent class although he had omitted nine class period transactions from his certification, information which was ultimately provided in discovery), *with Shiring,* 244 F.R.D. at 310, 317 (finding plaintiff had not demonstrated the requisite credibility as he had falsely stated on his certifications the date and price per share about his apparent one and only class period transaction).

Defendants' remaining objections relate to Gilbert's testimony about why he traded in Red Hat stock and to his control over and involvement in this litigation. The court has read Gilbert's deposition in its entirety and is convinced that his testimony is not so evasive or incredible as to warrant denial of class certification, that he is sufficiently involved in the litigation, and that he does not have interests antagonistic to the class.

Based on the foregoing, the court concludes Gilbert makes an adequate class representative.

### B. *Predominance*

As noted, plaintiffs seek certification under Rule 23(b)(3), which requires the court to "find[ ] that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members...." "The inquiry with respect to the predominance standard focuses on the issue of liability, and if the liability

issue is common to the class, common questions are held to predominate over individual ones." *In re BearingPoint, Inc.*, 232 F.R.D. at 542 (quotation and citation omitted).

■ To succeed on a claim under § 10(b) and Rule 10b–5,[7] a plaintiff must show

"(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation" (that is, the economic loss must be proximately caused by the misrepresentation or omission).

*In re Mutual Funds Invest. Lit.*, 566 F.3d 111, 119 (4th Cir.2009) (quoting *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 128 S.Ct. 761, 768, 169 L.Ed.2d 627 (2008)).

■ "Most of these elements are generally amenable to common proof; reliance, by contrast, is typically proven on an individual basis." *In re Boston Scientific Corp. Sec. Lit.*, 604 F.Supp.2d 275, 283 (D.Mass.2009) (citation omitted). "Reliance can, however, be treated as a common issue if it is *presumed* under the theory that the defendants defrauded the market—not the individual plaintiffs—so long as the plaintiffs purchased their stock in an efficient market." *Gariety*, 368 F.3d at 363.

The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.... Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.... The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in the case of direct reliance on misrepresentations.

*Basic, Inc. v. Levinson*, 485 U.S. 224, 241–42, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988).

■ As our Court of Appeals has consistently recognized,

To gain the benefit of th[is] presumption, a plaintiff must prove '(1) that the defendant made public misrepresentations; (2) that the misrepresentations were material; (3) that the shares were traded on an efficient market'; and (4) that the plaintiff purchased the shares after the misrepresentations but before the truth was revealed.

*In re Mutual Funds*, 566 F.3d at 120 (quoting *Gariety*, 368 F.3d at 364); *see also In re PEC Solutions, Inc. Securities Litigation*, 418 F.3d 379, 387 (4th Cir.2005) ("To establish reliance under a 'fraud on the market' theory, ... a plaintiff needs only to show the means of dissemination and the materiality of the misrepresentation, not 'direct' reliance.") (citing *Basic*, 485 U.S. at 243–47, 108 S.Ct. 978).

■ In this case, Gilbert invokes this presumption to show that reliance is a classwide issue and claims he satisfies all the necessary elements. There is no dispute that Red Hat stock traded on an efficient market.[8] In 2004, the stock traded on Nasdaq; it currently trades on the New York Stock Exchange. *See* http://investors.redhat.com/faq.cfm# (printed and attached hereto).[9]

---

7. As recognized earlier, plaintiffs also raise a § 20(a) claim against the individual defendants. That section directs joint and several liability against a person who controls another person who has violated any provision of the Securities Exchange Act or its regulations. 15 U.S.C. § 78t(a). Thus, the viability of the § 20(a) claim is dependent on the viability of the § 10(b) claim. *See In re Mutual Funds Lit.*, 566 F.3d at 130 (claim of control person liability under § 20(a) requires a predicate violation of § 10(b)); *Teachers' Retirement System of La. v. Hunter*, 477 F.3d 162, 188 (4th Cir.2007) (upholding dismissal of § 20(a) claim because such claim "requires a predicate violation of law" and the complaint failed to adequately allege a § 10(b) claim).

8. Gilbert submitted an expert report from Steven P. Feinstein to support a finding that Red Hat stock traded on an efficient market, among other things. (*See* Feinstein Report (DE# 175), at ¶¶ 15, 39–89.) Defendants do not challenge Gilbert's opinion that the market for Red Hat stock was efficient during the class period and beyond. (*See* Defs.' Mot. Exclude (DE# 176).)

9. With regard to this webpage and successive ones, the reader will note that the court did not print all information contained on the cited page; the court printed only relevant information.

In 2004, the average trading volume exceeded approximately 4 million shares in any given month. *See* http://finance.yahoo.com/q/hp?s=RHT&a=00&b=1&c=2004&d=11&e=31&f=200&g=m (printed and attached hereto). A number of analysts follow the stock. *See* http://investors.redhat.com/analysts.cfm (printed and attached hereto).[10] These factors support the finding of market efficiency for Red Hat stock. *See Gariety* 368 F.3d at 368 ("[T]o determine whether a security trades on an efficient market, a court should consider factors such as, among others, whether the security is actively traded, the volume of trades, and the extent to which it is followed by market professionals." (citation omitted)). Also, it is undisputed that defendants made the alleged misrepresentations at issue publicly via SEC filings, press releases, analyst conference calls, and an interview. (*See* Consol. Am. Compl. ¶¶ 114–87; Ans. ¶¶ 114–87.)

 Defendants characterize their opposition to application of the fraud-on-the-market presumption as one regarding the "materiality of the challenged statements" and contend Gilbert must establish loss causation for the presumption to apply. (Defs.' Mem. Opp'n at 2, 27.) As noted previously, materiality is one of the elements a plaintiff must prove to be entitled to use the presumption. "A fact is material 'if there is a substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact.' " *In re PEC Solutions*, 418 F.3d at 387. There is no assertion that this definition of materiality is not met. In a nutshell, plaintiffs allege that Red Hat engaged in a number of violations of accounting rules and standards, which resulted in inflated revenues and the issuance of false financial statements. Plaintiffs also advance that Red Hat misled investors about its method of accounting for subscription revenue. Certainly the disclosure of this information would be deemed important to a reasonable investor, and therefore, the court concludes that materiality is shown.[11]

Defendants' first argument regarding Gilbert's invocation of the fraud-on-the-market presumption merges consideration of various elements—standing, typicality, the class period, and the elements of the presumption itself. Irrespective of how one characterizes the argument, it is not sufficient for defendants to win the day. Specifically, defendants argue that on 25 March 2003, Red Hat publicly disclosed that it recognized subscription revenue monthly and that the disclosure had no effect on Red Hat's stock price. Defendants point out that the market did not react adversely to the disclosure; that this disclosure occurred prior to the end of the proposed class period; and that Gilbert did not purchase shares of Red Hat stock until after the disclosure and therefore suffered no economic loss (i.e., injury). (*See* Defs.' Mem. Opp'n at 2–3, 29.)

Resolution of this issue depends on whether Red Hat in fact disclosed the "truth"—its subscription revenue method—on 25 March 2003. In support of their argument that it did, defendants show that Red Hat disclosed as late as 10 January 2003, in an SEC filing, that it recognized subscription revenue "ratably over the period that the subscription services are provided" in accordance with

---

10. The court notes that Red Hat lists current analyst coverage, but has no reason to believe analyst coverage differed significantly in 2004.

11. In fact, the price of Red Hat stock dropped after each of the various disclosures purportedly associated with the revelation of Red Hat's fraud. (Consol. Am. Compl. ¶¶ 86, 92, 106; Ans. ¶¶ 86, 92, 106.) Arguably, such price drops may be evidence of materiality. *See Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 660–61 (4th Cir. 2004) (recognizing "[t]he majority rule seems to be that [a stock's price history] can be some evidence" of whether a fact was material, but declining to take a position on "this thorny issue"). The parties' experts agree that statistically significant stock price declines occurred after certain company announcements. *Compare* Mugmon Aff. (DE # 167), Ex. J *with* Feinstein Report (DE # 175). They differ, however, in their opinions as to what caused those changes in price. For the reasons discussed *infra* with regard to defendants' attempted rebuttal of the fraud-on-the-market presumption, the court cannot resolve this issue at this time.

Statement of Position No. 97–2.[12] (*See* Mugmon Aff. (DE # 167), Ex. I.) Defendants acknowledge that "Red Hat had not previously announced the units of time (i.e., minutes, hours, days, months) it used to allocate this revenue ratably[.]" (Defs.' Mem. Opp'n at 5.) Defendants go on to rely on then-CFO Thompson's statement on 25 March 2003 during a conference call with analysts:

> I think one thing to keep in mind ... as you look at our balance sheet and our deferred revenue balance, our revenues are recognized monthly, and our deferred revenues are driven by the payment terms and billing terms we have with our customers, so the growth in deferred revenue relates to both the timing of the bookings of subscriptions during the quarter and how much the customers agree to pay up front versus what they decide to pay quarterly.

(Mugmon Aff. (DE # 167), Ex. D at 7.) Defendants contend that this statement, in conjunction with the previous disclosure of ratable recognition, revealed the company's subscription revenue recognition policy. Thus, defendants continue, a presumption of class reliance cannot apply after this date and, because he did not purchase shares until after this date, Gilbert suffered no economic loss and cannot represent the class.

The picture is not so clear, however, as defendants paint it. As the court has recognized previously, Thompson's 25 March 2003 statement does not necessarily lead one to believe that Red Hat was pulling subscription revenues back to the beginning of the month. (*See* 5/12/06 Order at 8 n. 11.) This is particularly true when one considers (1) other statements Thompson made during that same conference call; (2) subsequent statements by Red Hat's representatives; and (3) analyst reaction to the announcement of the restatement.

During the 25 March 2003 conference call, in addition to the statement quoted above, Thompson said:

- "[A]pproximately 4,000 subscriptions of the Advanced Server subscriptions sold in Q4 will be deployed late in calendar 2003, and therefore, we will not begin to recognize revenue on these subscriptions until such time as the technology is deployed." (Mugmon Aff. (DE # 167), Ex. D at 3.)

- "The way our revenue recognition model works is we won't start recognizing revenue until the customer actually needs those technologies." (*Id.* at 10.)

- "They'll [i.e., 4,000 units that were not in deferred revenue] come into deferred revenues when contractually we're able to bill, so the billings are based on when the customers deploy...." (*Id.* at 13.)

During a 18 September 2003 conference call, Thompson stated:

> [W]e generally don't begin to recognize revenues from the sale of subscriptions to Red Hat Enterprise Linux until our technology is being deployed by our customers. This means that in many cases there will be a period of time between the purchase of the subscription by the customer and the date that we begin revenue recognition. This period of time is generally less than 90 days. Third, our revenue recognition practice is that we recognize revenues from the sale of subscriptions to Red Hat Enterprise Linux, Red Hat Enterprise Network, and Red Hat Enterprise Applications, [ratably] over the period of the subscription, which is generally one year.

Q2 2004 Red Hat, Inc. Earnings Conference Call—Final FD (Fair Disclosure) Wire (Sept. 18, 2003).

---

12. [Statement of Position ("SOP")] 97–2 deals with software revenue recognition. The Accounting Standards Executive Committee (AcSEC) of the American Institute of Certified Public Accountants (AICPA) issues SOPs that govern accounting methods for various types of businesses and financial concerns. The relevant part of SOP 97–2 states, "[i]f an arrangement to deliver software or a software system does not require significant production, modification or customization of software, revenue should be recognized when all the following criteria are met: persuasive evidence of an agreement exists; delivery has occurred; the vendor's fee is fixed or determinable; collectibility is probability [sic]." *In re Ravisent Techs., Inc.* No. Civ.A.00–CV–1014, 2004 WL 1563024, *1 n. 3 (E.D.Pa. July 13, 2004). (*See also* Mugmon Aff. (DE # 167), Ex. B.)

Then, on 17 June 2004, in an interview with *Bloomberg News*, CEO Szulik stated: You know it's interesting, we don't recognize revenue the way a traditional software company does. It's recognized as 100 percent of the revenues when the product is sold, so technically, we have 20 days per month to recognize that revenue, so if a, you know, a product or business is sold, on the 28th or the 29th of month, we only have one or two days of which to recognize the revenue for that sale, so in this current quarter—I'm sorry, the Q1 quarter that we just completed, there were one or two contracts that came in that had an impact that only gave us two or three days of revenue recognition but the good news of that of course, is that that sale will show up in deferred revenue, which is—which grew 21 percent quarter-over-quarter, so it catches up to us in the second quarter.

(Consol. Am. Compl. ¶ 184; *see also* Ans. ¶ 184.)

Taking all these statements together, up until the date of the public announcement of the restatement, 13 July 2004, it was not unreasonable to conclude that Red Hat was recognizing subscription revenue from software sales when the customer deployed the software, doing so ratably and not prior to the time the revenue was received. In fact, after Red Hat announced the restatement and the reason behind it, one analyst reacted, "The prior method was aggressive, and *was not our understanding of [Red Hat's] implementation of ratable recognition as described in its 10K.* We find it hard to understand how this was never picked up by internal controls or by auditors."[13] Michele Laverty, Credit Suisse First Boston, "Buy on Overreaction to Accounting Change," July 13, 2004 (quoted in Feinstein Report (DE # 175), at 44 (emphasis added).) Because the "truth" was not fully disclosed on 25 March 2003, Gilbert satisfies the final element of the fraud-on-the-market presumption; he traded shares between the time the misrepresentations were made and the time

the truth was ultimately revealed, i.e., during the class period.

 Defendants' other argument against application of the presumption concerns loss causation. To satisfy this element of a § 10(b) claim,

["]the plaintiff [must] show that the defendant's conduct was a substantial cause of its injury." That is, "as long as the misrepresentation is one substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement." The facts alleged in the complaint therefore need not conclusively show that the securities' decline in value is attributable solely to the alleged fraud rather than to other intervening factors.

*In re Mutual Funds,* 566 F.3d at 128 (citations omitted).

Defendant asserts that Gilbert must prove loss causation for the fraud-on-the-market presumption to apply. Defendants rely primarily on the Fifth Circuit's decision in *Oscar Private Equity Invests. v. Allegiance Telecom, Inc.,* 487 F.3d 261 (5th Cir.2007). In *Oscar,* the court determined a plaintiff must show loss causation, by a preponderance of the evidence, at the class certification stage to trigger the presumption. 487 F.3d at 265, 269; *see also Alaska Elec. Pension Fund v. Flowserve Corp.,* 572 F.3d 221 (5th Cir.2009). Most courts outside of the Fifth Circuit have rejected this decision. *See, e.g., In re Boston Scientific,* 604 F.Supp.2d at 286–87; *Lapin v. Goldman Sachs & Co.,* 254 F.R.D. 168, 185–86 (S.D.N.Y.2008); *In re Mills Corp. Sec. Lit.,* 257 F.R.D. 101, 107–09 (E.D.Va.2009) (collecting cases); *Schleicher v. Wendt,* No. 1:02–cv–1332–DFH–TAB, 2009 WL 761157, *12 (S.D.Ind. March 20, 2009). This court joins those courts and declines to add another element to the plaintiff's burden of establishing the fraud-on-the-market presumption. Because Gilbert has shown that defendants made public, material misrepre-

---

**13.** Although the analyst did go on to say, "Nevertheless, the amounts involved are immaterial at the revenue level and only sufficiently material at the bottom line to require restatement given the company's transition to break even in prior peri-

ods." Michele Laverty, Credit Suisse First Boston, "Buy on overreaction to accounting change," July 13, 2004 (quoted in Feinstein Report (DE # 175), at 44.)

sentations; that Red Hat stock traded on an efficient market; and that he traded shares between the time the misstatements were made and the disclosure of the truth, the class is entitled to invoke the fraud-on-the-market presumption.

 Further, the court declines to resolve whether defendants have rebutted the presumption (to the extent defendants' argument could be deemed an attempted rebuttal). There is no doubt the fraud-on-the-market presumption is subject to rebuttal. *Basic,* 485 U.S. at 248, 250, 108 S.Ct. 978; *see also Gariety,* 368 F.3d at 363. In *Basic,* referring to the lower court's decision, the Court states,

> [t]he court acknowledged that petitioners may rebut proof of the elements giving rise to the presumption, or show that the misrepresentation in fact did not lead to a distortion of price or that an individual plaintiff traded or would have traded despite his knowing the statement was false.
>
> Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance.

*Basic,* 485 U.S. at 248, 108 S.Ct. 978 (citation omitted).

In this case, the issue simply cannot be resolved at this stage, despite the fact that the court is required to undertake a "rigorous" analysis for purposes of class certification. Both sides rely on experts to support their respective arguments on whether Red Hat's misrepresentations and subsequent disclosures (or revelation of the fraud, in Gilbert's words) caused the stock price declines. In turn, as the cross-motions to exclude those experts evidence, each party invokes *Daubert* to suggest that the court cannot consider the opposing expert's opinion. The difficulty with engaging in a *Daubert* analysis now is that limited merits discovery has been under-

taken. And, the basis of defendants' argument for the exclusion of the class expert is not the methodology he used, but rather that he relies on inadmissible speculation and his opinions thus lack an evidentiary basis. The grounds for the class expert's opinions are necessarily limited because of the lack of merits discovery. Furthermore, the presumption of reliance and any rebuttal can be resolved by class-wide proof. In other words, the presumption can be proven, and rebutted, commonly; individualized proof is not necessary.[14] The court finds that common questions of liability predominate, and Rule 23(b)(3) is therefore satisfied. *See In re Boston Scientific,* 604 F.Supp.2d at 286–87 (finding predominance requirement met where lead plaintiff had adequately shown applicability of the fraud-on-the-market presumption and where issues raised by the defendants about loss causation were susceptible to common proof).

### III. DOCUMENTS FILED UNDER SEAL

Since the filing of the class certification motion, a number of documents have been filed under seal. It is not evident to the court the justification for filing all the documents under seal. For example, on 4 August 2008, Gilbert filed his entire reply brief and expert report under seal. The court recognizes that by order filed 15 November 2006, Magistrate Judge David Daniel held that the parties may deem certain information confidential and provided for the filing under seal of documents containing confidential information. However, this order cannot be deemed to permit the wholesale filing of documents under seal. The parties are directed to review the docket in this case via CM/ECF for entries indicating documents filed under seal. If any party desires any document(s) to remain filed under seal, such party shall file a motion to seal within 20 days of the date of this order, with such motion specifying the

---

**14.** The court does not mean to suggest that a *Daubert* analysis can never be undertaken at the class certification stage and/or when merits discovery has not occurred. Under other facts and circumstances, such an analysis may be warranted. *See, e.g., Rhodes v. E.I. du pont de Nemours & Co.,* No. 6:06–cv–00530, 2008 WL 2400944, *10–12 (S.D.W.Va. June 11, 2008) (in toxic tort case, court determined *Daubert* inquiry was necessary in conjunction with class certification determination because the plaintiffs relied on expert opinions to show the elements of their medical monitoring claim could be proven on a common, class-wide basis).

document(s), the reasons in support, and legal authority. If a motion to seal is not filed within that time as to a particular document, the Clerk is DIRECTED to unseal said document(s). In the future should any party wish to file a document under seal, the party must file a motion to seal in accordance with Local Civil Rule 79.2.

## IV. CONCLUSION

For the foregoing reasons, Gilbert's motion for class certification is ALLOWED. The cross-motions to exclude expert reports are DENIED WITHOUT PREJUDICE. It is ORDERED that:

1. This action is hereby certified as a class action under Fed.R.Civ.P. 23(b)(3).

2. The certified class is defined as all purchasers of the common stock of Red Hat, Inc. between December 17, 2002 and July 12, 2004, inclusive and who were damaged thereby, but excluding Red Hat, Inc., Matthew J. Szulik, and Kevin B. Thompson, any entity in which any excluded person has or had a controlling interest, the officers and directors of Red Hat, Inc. and the legal affiliates, representatives, heirs, controlling persons, successors, and predecessors in interest or assigns of any such excluded party.

3. The class claims are for violations of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b–5 against Red Hat, Inc., Matthew J. Szulik, and Kevin B. Thompson and for violation of 15 U.S.C. § 78t(a) against Matthew J. Szulik and Kevin B. Thompson.

4. Charles Gilbert is appointed class representative.

5. Coughlin Stoia Geller Rudman & Robbins LLP is appointed class counsel.

6. Within 30 days of the date of this order, the parties are directed to confer about a proposed schedule for merits discovery and the filing of dispositive motions and file a proposed scheduling order regarding the same.

7. Within 30 days of the date of this order, Gilbert shall file a memorandum regarding the provision of notice to the class in accordance with Fed.R.Civ.P. 23(c)(2)(B).

Red Hat, Inc. - Investor FAQs

**redhat.**

Search

- **Services & Products**
- **Solutions**
- **Partners**
- **Developers**
- **Training**
- **Support**
- **Company**
- **Buy Online**

## Investor FAQs

🖶 Print page ✉ Email page

⊞ show all

⊞ What is your fiscal year?

⊞ How many employees do you have?

⊞ When and where was Red Hat incorporated?

⊞ When was Red Hat's initial public offering (IPO)?

⊞ Has Red Hat held any subsequent offerings?

⊞ What is a secondary offering?

⊞ What were the proceeds from the secondary offering used for?

⊞ How many shares does Red Hat have outstanding?

⊞ Does Red Hat offer a direct stock purchase program?

⊞ Does Red Hat offer a dividend reinvestment program (DRIP)?

⊞ Does Red Hat offer Direct Registration System (DRS) stock transfers?

⊞ Whom should I contact for more information about using the DRS system for my Red Hat shares?

⊞ Where can I get information about my stock certificates or ownership records?

⊟ Where is Red Hat's stock traded?

As of December 12, 2006, the company's stock trades on the New York Stock Exchange (NYSE) under the symbol RHT. Prior to that date, the stock traded on Nasdaq.

⊞ Who are Red Hat's independent accountants?

⊞ Has the Board of Directors of Red Hat ever approved a stock repurchase program?

⊞ Who are Red Hat's top executives?

⊞ Where is Red Hat's headquarters?

⊞ When is the annual shareholder meeting?

⊞ Which analysts currently follow Red Hat?

⊞ When does Red Hat report quarterly financial results?

⊞

Shareholder Tools

- Shareholder Briefing
- Investment Calculator
- Download Library
- RSS News Feeds

Investor Relations
1801 Varsity Drive
Raleigh, NC 27606
Phone: 1-919-754-3700
E-mail:
investors@redhat.com

**Historical Prices**

ADVERTISEMENT

Get Historical Prices for

Start Date: Jan 1 2004 to Jan 1, 2003
End Date: Dec 31 2004

○ Daily
○ Weekly
○ Monthly
○ Dividends Only

| Date | Open | High | Low | Close | Avg Vol | Adj Close* |
|------|------|------|-----|-------|---------|-----------|
| Dec-04 | 14.81 | 15.55 | 12.55 | 15.35 | 7,963,900 | 13.35 |
| Nov-04 | 12.30 | 15.07 | 11.21 | 14.48 | 7,427,900 | 12.34 |
| Oct-04 | 9.58 | 11.60 | 7.59 | 12.41 | | 12.34 |
| Sep-04 | 12.19 | 15.55 | | 12.23 | 7,400,800 | 12.23 |
| Aug-04 | 12.36 | | 11.95 | 12.28 | 8,719,900 | 12.26 |
| Jul-04 | | 23.51 | 13.81 | 17.12 | 8,505,900 | 17.12 |
| Jun-04 | 23.83 | 29.05 | 19.84 | 22.97 | 8,819,900 | 22.97 |
| May-04 | 22.68 | 28.06 | 22.61 | 27.33 | 4,402,700 | 27.33 |
| Apr-04 | 18.19 | 28.58 | 23.38 | 23.72 | 4,234,200 | 23.72 |
| Mar-04 | 18.19 | 24.15 | 17.10 | 23.05 | 7,864,000 | 23.05 |
| Feb-04 | 17.58 | 19.00 | 11.52 | 18.09 | 3,971,000 | 19.09 |
| Jan-04 | 19.05 | 21.58 | 18.28 | 19.30 | 8,583,000 | 19.30 |

* Close price adjusted for dividends and splits.

Ax Download 12 Symbols back

- Add to Portfolio - Set Alert - Email to a Friend

Get Historical Prices for Another Symbol: - Symbol Lookup

- Stock Screener
- Mergers & Acquisitions

98